**MICHIGAN BELL TELEPHONE COMPANY, INCORPORATED, d/b/a SBC Michigan, Plaintiff,**

v.

**J. Peter LARK, Laura Chappelle, and Robert B. Nelson, in their Official Capacities as Commissioners of the Michigan Public Service Commission and not as Individuals, Defendants, and**

**At & T Communications of Michigan, Inc., and Mcimetro Access Transmission Services, LLC, Intervenor–Defendants.**

No. 04–60128.

United States District Court, E.D. Michigan, Southern Division.

Jan. 6, 2005.

Joseph P. Tocco, Dickinson Wright, Craig A. Anderson, Detroit, MI, John M. Dempsey, Dickinson Wright, Lansing, MI, Michael G. Vartanian, Dickinson Wright, Ann Arbor, MI, Demetrios G. Metropou-los, Theodore A. Livingston, Mayer, Brown, Chicago, IL, for Plaintiff.

Steven D. Hughey, Department of Attorney General, Lansing, MI, for Defendants and Intervenor–Defendants.

Albert Ernst, Dykema Gossett, Lansing, MI, Allison M. Ellis, Washington, DC, John R. Harrington, Jenner & Block, David W. Carpenter, Sidley, Austin, John J. Reidy, III, Chicago, IL, Robert J. Franzinger, Dykema Gossett, Arthur A. Le-Vasseur, Fischer, Franklin, Detroit, MI, for Intervenor–Defendants.

### OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BATTANI, District Judge.

Before the Court is Plaintiff Michigan Bell Telephone Company's d/b/a SBC Michigan ("SBC Michigan") Motion for Summary Judgment brought pursuant to Fed.R.Civ.P. 56(c). At issue is the validity of a June 29, 2004 Order in case number U–13891, issued by the Michigan Public Service Commission ("MPSC"), acting through Defendant Commissioners, J. Peter Lark, Laura Chappelle and Robert B. Nelson. The parties stipulated to allow AT & T Communications of Michigan, Inc. ("AT & T") to intervene pursuant to Fed.R.Civ.P. 24(b)(2), and MCImetro Access Transmission Services, LLC ("MCImetro") to intervene pursuant to Fed.R.Civ.P. 24(a).

The Court heard oral argument on September 10, 2004. In addition, the Court has reviewed SBC Michigan's Submission of Supplemental Authorities as well as the response filed October 22, 2004, by the Intervenor/Defendants MCImetro and AT & T. For the reasons that follow, the Court GRANTS Plaintiff's motion.

## I.  STATEMENT OF FACTS

On September 30, 2003, the MPSC at the behest of the Federal Communications Commission ("FCC") issued an order commencing a proceeding, Case No. U–13891, to investigate and to implement, if necessary, a batch hot cut migration process.[1] On June 18, 2004, SBC Michigan filed a motion to dismiss the case, alleging that the decision in *United States Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C.Cir.) (*USTA II*), cert. denied, —— U.S. ——, 125 S.Ct. 345, 160 L.Ed.2d 223 (2004), vacated the MPSC's authority to implement a batch hot cut process.

On June 29, 2004, the MPSC denied the motion and adopted SBC Michigan's proposed batch hot cut process on an interim basis.  It further ordered the parties in that proceeding to "engage in collaborative discussions to reach agreements regarding the content and testing procedures for a final batch cut migration process."  Pl.'s Ex. 1 at 23.  Talk American Inc. timely filed a petition for rehearing and clarification, asking the MPSC to clarify the jurisdictional basis for the June 29, 2004 Order.  That motion was pending at the time this Court heard oral argument.

Plaintiff subsequently filed this action for declaratory and injunctive relief, pursuant to the Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.* (2001).  Plaintiff challenges the MPSC's June 29, 2004 Order, arguing it is contrary to the decision in *USTA II* (vacating in part the efforts of the FCC to fashion rules relating to the competitive relationship between telecommunications carriers).  Plaintiff as-serts that the MPSC mandated procedures in its June 29, 2004 Order that are preempted by federal law.  More specifically, Plaintiff contends that MPSC was acting under a delegation of authority from the FCC, which the circuit court subsequently held unlawful.  Consequently, it asks this Court to set aside the challenged MPSC Order.

Defendants assert that the June 29, 2004 Order is a proper exercise of authority under state law, which is consistent with federal law, and that the motion must be stayed because it is not an appeal of a final order issued by the MPSC.  Intervenor–Defendants AT & T and MCImetro join in supporting Defendants' position that the MPSC has independent state authority that validates the June 29, 2004 Order.  They also assert that the proceedings mandated in the June 29, 2004 Order comport with federal law.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) authorizes the Court to grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  There is no genuine issue of material fact if there is no factual dispute that could affect the legal outcome on the issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  In other words, the movant must

---

1.  When a mass market customer changes from SBC Michigan's local exchange service switch to local exchange service provided by a competing carrier's switch, the connection between the customer's loop and SBC Michigan's switch must be severed and a new connection must be established between the customer's loop and the competing carrier's switch.  The procedure is performed while the customer's line is in service—it is cut while it is hot.  Accordingly, the FCC used the term "hot cut" to refer to the process.  *See In re Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, ("Triennial Review Order" or "TRO"), 18 FCC Rcd. 16,978, ¶ 465 (2003).  A batch cut occurs when the incumbent carrier simultaneously migrates two or more loops.

show it would prevail on the issue even if all factual disputes are conceded to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. ANALYSIS

Before turning to the merits of Plaintiff's motion, the Court addresses a preliminary matter raised by Defendants: whether the doctrine of primary jurisdiction precludes judicial resolution of this motion at this time. For the reasons that follow, the Court finds that it does not.

### A. Primary Jurisdiction Doctrine

█ The doctrine of primary jurisdiction "arises when a claim is properly cognizable in court but contains some issue within the special competence of an administrative agency." *United States v. Haun*, 124 F.3d 745, 749 (6th Cir.1997). When the doctrine applies, court proceedings are stayed so that the agency may bring its special competence to bear on the issue. *Id.*, (citing *Reiter v. Cooper*, 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993)). Unfortunately, "[n]o fixed formula exists for applying the doctrine [.]" *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). Rather, "[i]n every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Id.* Those reasons include the "desire for uniformity in adjudication and the belief that the decisionmaker with the most expertise and broadest perspective regarding a statutory or regulatory scheme will be most likely to resolve the issue correctly." *Id.*

█ Here, Defendants bear the burden of persuading the Court that the case "requires resolution of issues that have been placed within the special competence of an administrative body," *MCI Telecomm. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1103 (3d Cir.1995), *cert. denied*, 519 U.S. 815, 117 S.Ct. 64, 136 L.Ed.2d 25 (1996), and they have failed to do so. Defendants' argument is built upon their position that MPSC based its decision to proceed with the development of a batch cut process on state law. In its June 29, 2004 Order, the MPSC invoked jurisdiction under the Michigan Telecommunications Act ("MTA") Mich.Comp.Laws § 484.2101, *et seq.* (1998), and the Michigan legislature has committed primary responsibility for implementing the MTA to the MPSC. Therefore, Defendants conclude that this Court should have the benefit of the MPSC's final analysis of its duties under Michigan law before it conducts a review of the June 29, 2004 Order.

Defendants' argument fails to convince the Court. The rehearing petition asks MPSC to clarify the state law basis for its decision to proceed with the development of a batch cut process. A legal question is implicated, not a question involving technical or policy considerations, thereby falling within the MPSC's field of expertise. Moreover, this Court already has the MPSC's analysis of the arguments advanced by Plaintiff in this litigation-Plaintiff's motion to dismiss the state proceedings raised the same arguments advanced in its summary judgment motion in this Court. In sum, there is no reason to forestall a ruling on the issues raised by Plaintiff, and the Court turns to the issue of whether the action is authorized under state and/or federal law.

### B. Statutory Background

A summary of the steps and missteps and interplay between the Telecommunications Act of 1996 (the "Act"), the FCC, and the D.C. Circuit Court places the June 30, 2004 Order in the proper context. The Telecommunications Act of 1996 seeks pri-

marily to promote competition in the previously monopoly-driven local telephone service market. *See Verizon Communications, Inc. v. FCC,* 535 U.S. 467, 475–76, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002). It requires the incumbent local telephone service provider (SBC Michigan in this case) to allow new market entrants to interconnect with and access the incumbent's network for a fair price. 47 U.S.C. § 251(c) (2001). Specifically, incumbent local exchange carriers ("ILECs") must allow competing carriers, known as competitive local exchange carriers ("CLECs"), to use their networks-loops, switching and transport-at cost-based rates, a practice known as "unbundling." *See* 47 U.S.C. § 251(c)(3).

The Act delegates the task of determining those network elements that must be unbundled to the FCC. *See* 47 U.S.C. § 251(c)(3). In determining whether a network element should be unbundled, the Act requires the FCC to consider "at a minimum" two criteria: first, whether "access to such network elements as are proprietary in nature is necessary," and second, whether "the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." 47 U.S.C. § 251(d)(2).

Pursuant to that authority, the FCC has issued a series of orders addressing the scope of ILECs' obligation to unbundle their network elements. Its previous attempts to fashion competition rules were invalidated once by the U.S. Supreme Court in *AT & T Corp. v. Iowa Util. Bd.,* 525 U.S. 366, 390, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (rejecting a blanket approach to an incumbent's duty to share), and again by the U.S. Court of Appeals for D.C. Circuit in *United States Telecom Ass'n v. FCC,* 290 F.3d 415, 425–30 (D.C.Cir.2002) ("*USTA I*") (rejecting an

"open-ended" judgment that more unbundling is better did not comport with the impairment standard), *cert. denied sub nom WorldCom, Inc. v. U.S. Telecom Ass'n,* 538 U.S. 940, 123 S.Ct. 1571, 155 L.Ed.2d 344 (2003).

The FCC subsequently addressed the holding in *USTA I* and the Act's impairment requirement in its Triennial Review Order ("TRO"). In fashioning the TRO, the FCC considered, among other things, mass market switching, which is used to service mass market customers, including residential and certain small business customers with a limited number of traditional DS0 telephone lines. The FCC recognized that competing carriers · had installed a significant number of their own switches and acknowledged that CLECs "may not be impaired without access to unbundled switching in . . . specific markets." TRO, ¶ 473. The FCC did not make a final determination of impairment or non-impairment for any particular geographic area. Rather, it made a provisional nationwide finding of "impairment" and delegated the remaining tasks-the initial "market definition" and the ultimate assessment of impairment for each market—to the states. Further, it issued detailed rules for the states to apply in reaching those determinations. TRO, ¶¶ 458–463; 47 C.F.R. 51.319(d)(2).

One component of the FCC-delegated analysis for mass market switching was the batch hot cut process. Specifically, the FCC directed states to define geographic markets and to determine for each market whether CLECs would be impaired without either (i) unbundled access to mass market switching from the incumbent or (ii) a new batch hot cut process. For markets where such impairment existed, the FCC instructed state commissions to develop and establish that batch cut process. *See* 47 C.F.R. § 51.319(d)(2)(ii).[2]

**2.** Pursuant to the regulation, "If a state com-      mission concludes that the absence of a batch

State commissions were required to complete the task within nine months of the TRO's effective date. TRO, ¶ 527.

Within a week of the release of the TRO, MPSC "sought comments on the TRO implementation, including the batch cut migration process." Pl.'s Ex. 2; Order Commencing Proceedings, Case No. U–13891. Even as it participated in the state proceedings, SBC Michigan (and other incumbent carriers) challenged the rules through petitions for judicial review. The appeals were consolidated, and on March 2, 2004, the D.C. Circuit issued a decision on the appeals.[3] In *USTA II*, the court held that the "federal agency officials...may not subdelegate [their decision making authority] to outside entities—private or sovereign—absent affirmative evidence of authority to do so." 359 F.3d at 566. Because the circuit court found no affirmative evidence, it deemed the subdelegation improper. Consequently, it directed the FCC to adopt new unbundling rules in which the FCC, not the states, would make the impairment analysis. *Id.* at 568–75. Finally, the *USTA II* Court summarized it decision, "We vacate the [FCC's] subdelegation to state commissions of decision-making authority over impairment determinations, which in the context of this Order applies to the subdelegation scheme established for mass market switching and certain dedicated transport elements (DS1, DS3, and dark

fiber). We also vacate and remand the Commission's nationwide impairment determinations with respect to these elements." *Id.* 359 F.3d at 594. The D.C. Circuit Court stayed the issuance of its mandate. On June 16, 2004, it formally vacated the FCC rules.

ICECs, the National Association of Regulatory Utility Commissioners ("NARUC") and individual states filed petitions for *certiorari*, which the Supreme Court denied October 12, 2004. Therefore, *USTA II* stands as controlling authority.

## C. Compliance with Federal Law

In deciding whether Plaintiff is correct that the June 29, 2004 Order is contrary to federal law, the Court examines not only the plain language of the Order itself, but also the FCC regulation it purports to implement, the circuit court decision in *USTA II*, and the FCC's subsequent Order and Notice of Proposed Rulemaking. In addition, the Court must ascertain whether state law provides an independent basis of sustaining the Order. Accordingly, the Court first directs its attention to the June 29, 2004 Order.

In the Order, the MPSC concluded that the batch cut requirements were not vacated and that it was required to establish a batch hot cut migration process even if the FCC must make its own impairment determinations. *See* Pl.'s Ex. 1, June 29, 2004 Order, p. 18. The MPSC further

cut migration process is not impairing requesting telecommunications carriers' ability to serve end users using DS0 loops in the mass market without access to local circuit switching on an unbundled basis, that conclusion will render the creation of such a process unnecessary. In such cases, the state commission shall issue detailed findings regarding the volume of unbundled loop migrations that could be expected if requesting telecommunications carriers were no longer entitled to local circuit switching on an unbundled basis, the ability of the incumbent LEC to meet that

demand in a timely and efficient manner using its existing hot cut process, and the non-recurring costs associated with that hot cut process. The state commission further shall explain why these findings indicate that the absence of a batch cut process does not give rise to impairment in the market at issue." 47 C.F.R. § 51.319(d)(2)(ii).

3. Under the Hobbs Act, 28 U.S.C. § 2342, the United States Court of Appeals for the D.C. Circuit has exclusive jurisdiction to review the FCC's Order.

found that it has jurisdiction under the MTA[4] to ensure a competitive market for local exchange service in Michigan, and that abandonment of the proceedings would be detrimental to competition and contrary to the "intent of federal and state law." *Id.*, p. 19. The Commission therefore approved the batch cut migration process detailed in the Order on an interim basis. Pl.'s Ex. 1, p. 23.

■ The Court disagrees with the conclusion that the batch cut requirements were not vacated. Pursuant to the FCC regulation, 47 C.F.R. § 51.319(d)(2)(ii), the MPSC could not establish a batch cut process without first "conclud[ing] that the absence of a batch cut migration process is...impairing requesting telecommunications carriers' ability to serve end users" in Michigan, and that the process it adopted would "alleviate [that] impairment." *USTA II* held the regulation at issue constituted an unlawful delegation of authority to the states. The plain language of the regulation locks the batch cut directive to the impairment finding, and the circuit court in *USTA II*, 359 F.3d at 565, vacated the FCC's decision to order unbundling of mass market switches. Because the rule has been vacated as contrary to federal law, the June 29, 2004 Order, which arises out of the rule, likewise is contrary to federal law.

The FCC's conduct post *USTA II*, shows a similar understanding of the import of the decision. On August 20, 2004, the FCC adopted and released an Order and Notice of Proposed Rulemaking ("Order and Notice"), in which it solicits comments on alternative unbundling rules to implement the obligations of § 251(c)(3) "in a manner consistent" with the *USTA II* decision. Order and Notice, ¶ 1. To avoid

disruption in the industry while the new rules are being written, the Order and Notice preserves for six months certain obligations "as they existed...except to the extent they have been superseded by voluntarily negotiated agreements, an intervening order from the FCC, or a state public utility commission order (with respect to rates only)." *Id.* at ¶ 21. The plan contemplates a second six-month period during which "competitive carriers would retain access to network elements that the Commission has not subjected to unbundling...." *Id.* Contracts that predated the vacated rules remain in place, but under the interim approach competing carriers cannot expand contractual rights. *Id.* at ¶ 23. The FCC specifies that the interim approach *"forecloses the implementation and propagation of the vacated rules." Id.* (emphasis added).

In its attempt to have the decision reversed, the NARUC, of which MPSC is a member, advanced arguments that mirror the FCC's reading of *USTA II*. For example, it observed in its petition that the D.C. Circuit vacated portions of the FCC's TRO "requiring incumbent local exchange carriers to share components of their local networks with competitors and establishing extensive federal standards to guide State Commissions in determinations of which unbundled network components do not have to be shared." *NAT'L ASS'N OF REGULATORY UTILITY COMMISSIONERS v. UNITED STATES TELECOM ASS'N*, Petition for a Writ of Certiorari to the United States Court of Appeals for the District of Columbia Circuit Court, 2004 WL 1475967 (U.S. June 30, 2004) (No. 04–12). The NARUC further characterized the decision as finding "that States can play no role in these determina-

---

4. The MTA was enacted to encourage competition in the industry. It requires incumbent carriers to "unbundle and separately price each basic local exchange service of-fered...and allow other providers to purchase such services on a nondiscriminatory basis." Mich.Comp.Laws § 484.2355 (1998).

tions...uphold[ing] broad FCC determinations limiting other sharing ('unbundling') rights" and "jeopardiz[ing] competition in the local exchange market that has developed over the last decade, which is dependent on those rights." *Id.* at *18. The petition added, "[T]he court's decisions effectively limits States' ability to play further substantive role. The FCC is not well positioned to succeed without the States' assistance, given the heavy burden the Court imposed as a prerequisite to authorizing unbundling. The result is an order that effectively disables many of the Act's critical leasing provisions. It also flies in the face of the cooperative scheme established by the Act and the express authority given to States to make unbundling determinations." *Id.* at *19. The response of the MPSC supporting NARUC's petition echoed these arguments. *See* 2004 WL 1665337.

Defendants' state proceeding, which continued even after the decision and mandate issued in *USTA II*, is seemingly at odds with the position advanced in the MPSC's attempt to have the decision reversed as well as the *Order and Notice.* The FCC batch cut requirements have been vacated, and MPSC's position that the batch cut portion of the FCC's rule was not vacated, *see* Pl.'s Ex. 1 at 18, is unavailing. According to Defendants, the MPSC's batch cut proceeding was not part and parcel of the FCC's delegation of impairment determi-

nations; rather, Case. No. U–13891 was initiated to investigate existing batch cut processes and, if necessary, adopt new procedures.[5] Defendants' assertion that the FCC's delegation of impairment determinations to state commissions was separate from its requirement that state commission undertake an investigation of the batch cut process ignores the plain language of the regulations. The state commissions were to explore specific mechanisms to ameliorate or eliminate the costs of the hot cut process, but only if they found competing CLECs were impaired. *See* 47 C.F.R. § 51.319(d)(2). The Order and Notice explicitly forecloses the implementation and propagation of the rules. Further, the FCC requested state commissions to "file summaries of state proceedings" and "efforts to develop batch hot cut processes." The FCC also specified in the Order and Notice that obligations that predated the vacated rules were frozen, and CLECs were prevented from expanding their contractual rights. Order and Notice, ¶ 23. This directive further undermines Defendants' argument.

Defendants' reliance on provisions of the Telecommunications Act of 1996 that reflect that regulatory authority is shared with the state cannot be countenanced by this Court, which, in essence, it being asked to ignore *USTA II*. The *USTA II* decision warned that state commissioners

---

5. Intervenor–Defendants advance the position that batch cuts are just a detail of providing loops and not part of the "scheme for subdelegating mass market switching determinations," found unlawful in *USTA II*. Because there is no prohibition in federal law preventing carriers from providing loops as effectively as possible, there is no basis for this Court to find the June 29, 2004 Order contrary to federal law.

The Court rejects Intervenor–Defendants' characterization of the Order as addressing the condition of providing loops and therefore independent of the need to find impairment with switches. The batch cut rules were part of the scheme for subdelegating mass market switching determinations on impairment, not part of the access to loops. The section of the TRO devoted to loops is found at ¶¶ 197–343. Not one of the paragraphs mentions batch cuts. The TRO covers batch cuts in the section addressing mass market switching, found at ¶¶ 464–75; 459–527. The regulations likewise separate loops (47 C.F.R. § 51.319(a)) and mass market switching (47 C.F.R. § 51.319(d)), which contains a subsection on batch cuts (47 C.F.R. § 319(d)(2)(ii)).

might "not share the agency's national vision and perspective, and thus may pursue goals inconsistent with those of the [FCC] and the underlying statutory scheme." 359 F.3d at 565–66. In short, the circuit court rejected the argument that the 1996 Act does not give the FCC the exclusive authority to make unbundling determinations. *Id.* at 568.

There is no dispute that the state is free to adopt procompetitive requirements. *See* 47 U.S.C. § 261(b). The bottom line, however, is Section 261 of the Act authorizes states to enforce procompetitive state regulations, "provided the state's requirements are not inconsistent" with the statute and FCC regulations. 47 U.S.C. § 261(c). So the MPSC may impose batch cut requirements under state law, but only if its action is not contrary to federal law. Defendants' position is that SBC Michigan has not identified any provision in the 1996 Act or in the FCC rules that bars, or is even inconsistent with, the batch cut proceedings. Their position is undermined by the simple fact that the state-imposed requirements are at odds with *USTA II* and the subsequent Order and Notice. It is incongruous for the *USTA II* Court to find that Congress prohibited the FCC from passing unbundling decisions to the state, but found the states could seize the authority themselves.

Finally, Defendants' reference to the many provisions of state statutory law that recognize the role the state commission plays in fostering competition do not aid the Court's analysis as the MTA likewise requires the MPSC to act in ways consistent with "all federal telecommunications laws, rule, orders, and regulations that are delegated to the state." *See* Mich.Comp. Laws 484.2201. Therefore, state statutory law does not salvage Defendants' June 29, 2004 Order.

In reaching the conclusion that Defendants are constrained by *USTA II* and the

FCC's subsequent Notice and Order, the Court finds it unnecessary to discuss the alternative argument raised by Plaintiff, i.e., that the June 29, 3004 Order circumvents the Act's established process of negotiation and arbitration in violation of § 252 of the Act.

## IV. CONCLUSION

The MPSC cannot act in a manner inconsistent with federal law and then claim its conduct is authorized under state law. It must challenge the decision in *USTA II* through the appropriate channels. When the D.C. Circuit acts as a Hobbs Act reviewing court, its decision is binding on this court. 28 U.S.C. § 2349(a). This Court is not free to ignore the mandate issued by the circuit court, and it cannot condone Defendants' decision to do so. For the reasons discussed above, the Court GRANTS Plaintiff's Motion for Summary Judgment.

IT IS FURTHER ORDERED that Defendant Commissioners are permanently enjoined from enforcing the MPSC Order.

IT IS SO ORDERED.